IN THE MATTER OF: THE APPEAL OF NORTH CAROLINA SAVINGS AND LOAN LEAGUE AND BURKE COUNTY SAVINGS AND LOAN ASSOCIATION FROM JUDGMENT OF CREDIT UNION COMMISSION IN CONTESTED CASE RELATING TO BY-LAWS OF STATE EMPLOYEES' CREDIT UNION AND NORTH CAROLINA BANKERS ASSOCIATION, INC., PETITIONER v. NORTH CAROLINA CREDIT UNION COMMISSION AND ROY D. HIGH, ADMINISTRATOR OF CREDIT UNION, RESPONDENTS

No. 82

(Filed 7 April 1981)

**1. Banks and Banking § 1— amendment of bylaws of State Employees' Credit Union — standard for judicial review of agency decision**

The appropriate standard for judicial review of the decision of the N. C. Credit Union Commission enlarging the field of membership of the State Employees' Credit Union was that provided by G.S. 150A-51(4), and the appropriate line of inquiry on appeal was therefore whether the Commission's approval of the Credit Union bylaw amendment was "affected by . . . error of law."

**2. Banks and Banking § 1— State Employees' Credit Union — local government employees — no common bond of similar occupation**

State, county and municipal employees do not share a "common bond" of similar occupation within the meaning of G.S. 54-109.26, and the N. C. Credit Union Commission therefore erred in approving an amendment to the bylaws of the State Employees' Credit Union permitting an expansion of the field of membership to include certain county and municipal employees.

**3. Banks and Banking § 1— credit union — common bond**

To qualify as a common bond within the meaning of G.S. 54-109.26, which provides that all persons eligible for membership in a credit union must share one and the same common bond, the trait or factor must be common to all eligible membership, and its very nature must provide the assurance of stability.

**4. Banks and Banking § 1— State Employees' Credit Union — local government employees — no common bond of similar occupation**

Because county, municipal and state employees do not *all* engage in similar types of work with similar job descriptions, they do not share a common bond of similar occupation, since similarity in occupation means similarity in the actual work done rather than similarity in who is benefited and who pays; therefore, an amendment to the bylaws of the State Employees' Credit Union permitting an expansion of the field of membership to include certain county and municipal employees could not be upheld on this basis.

**5. Banks and Banking § 1— State Employees' Credit Union — local government employees — no common bond of similar association or interest**

The class of persons eligible for membership in the State Employees' Credit Union under the amended bylaw in question did not possess the common bond of similar association or interest, and limitation of membership to governmental

Savings and Loan League v. Credit Union Comm.

employees covered under a state administered retirement system did not provide a common bond of similar interest.

Justice EXUM dissenting.

Justice COPELAND joins in the dissent.

ON discrectionary review of the decision of the Court of Appeals, 45 N.C. App. 19, 262 S.E. 2d 361 (1980) (opinion by *Judge Hedrick* with *Judges Martin (Robert M.)* and *Wells* concurring), which reversed judgment in favor of petitioners by *Judge Braswell*, entered at the 2 January 1979 Session of WAKE Superior Court. In entering judgment for the petitioners, *Judge Braswell* reversed the North Carolina Credit Union Commission's decision of 10 August 1978 approving an amendment to the bylaws of the State Employees' Credit Union.

By this appeal, we consider whether those persons added by the bylaw amendment to the field of membership of the State Employees' Credit Union share a "common bond," within the meaning of G.S. 54-109.26, with those previously eligible for membership.

This case was argued as No. 17 at the Fall Term 1980.

*Law Offices of John R. Jordan, Jr., by John R. Jordan, Jr., Robert R. Price, and Henry W. Jones, Jr.; and Alfred P. Carlton, Jr., for petitioner-appellant North Carolina Bankers Association, Inc.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by L.P. Mc-Lendon, Jr., and Edward C. Winslow III, for petitioner-appellants North Carolina Savings and Loan League and Burke County Savings and Loan Association.*

*Byrd, Byrd, Ervin & Blanton, P.A., by John W. Ervin, Jr., for petitioner-appellant Burke County Savings and Loan Association.*

*Bailey, Dixon, Wooten, McDonald & Fountain, by J. Ruffin Bailey and Gary S. Parsons, for respondent-appellee State Employees' Credit Union.*

*Barringer, Allen and Pinnix, by Thomas L. Barringer, for respondent-appellees North Carolina Credit Union Commission and Roy D. High, Administrator of Credit Unions.*

*C. Ronald Aycock for respondent-appellee North Carolina Association of County Commissioners.*

*Ernest Ball for respondent-appellee North Carolina League of Municipalities.*

CARLTON, Justice.

I.

This case arose from the North Carolina Credit Union Administrator's (hereinafter "Administrator") approval on 15 September 1977 of an amendment to the By-Laws (sic) of the State Employees' Credit Union, allowing an expansion of its field of membership to include employees of local governmental units who participate in retirement systems administered by the State of North Carolina and federal employees working in conjunction with these units. Prior to the amendment, Article II, Section 1 of the bylaws provided that:

> The field of membership shall be limited to those having the following common bond: employees of the State of North Carolina and Federal employees working in conjunction with State departments; employees of Public Boards of Education; employees of associations formed for the benefit of State Employees, . . . and unremarried spouses of persons who died while in the field of membership of this credit union: persons retired from the above employment as pensioners and/or annuitants from the above employment or service; members of their immediate families, and organizations of such persons: and employees of agencies or departments whose employees are subject to the State Personnel Act.

As amended, the bylaw would read as follows:

> The field of membership shall extend to those having the following common bond: employees of governmental units in North Carolina whose employees are covered under a retirement system administered by the State of North Carolina*; Federal employees working in conjunction with these governmental units; employees of agencies or departments whose employees are subject to the State Personnel Act; employees of associations formed for the benefit of the above persons; unremarried spouses of persons who died while in the field of membership; persons retired from any of the above as pensioners and/or

annuitants; members of their immediate families and organizations of such persons . . . .

> *Employees of county, municipal, and related govern-
> ment units (excluding employees of county depart-
> ments of Social Services, Health, Mental Health,
> and Civil Defense) who currently have a credit
> union chartered by North Carolina or the Federal
> Government and who are not included in that field
> of membership are not eligible for membership in
> the State Employees' Credit Union.

In response to a request by the North Carolina Bankers Association, the North Carolina Credit Union Commission (hereinafter "Commission") conducted hearings on 5 and 6 June 1978 to review the decision of the Administrator. The Commission granted petitions from the North Carolina Savings and Loan League and the Burke County Savings and Loan Association to intervene in opposition to the amendment. The State Employees' Credit Union (hereinafter "Credit Union"), the North Carolina Association of County Commissioners, and the North Carolina League of Municipalities were granted leave to intervene in support of the Administrator's action. On 10 August 1978 the Commission issued a decision affirming the approval of the bylaw amendment by the Administrator.

Pursuant to G.S. 150A-43, the Bankers Association, Savings and Loan League and Savings and Loan Association (hereinafter "petitioners") filed petitions in superior court for review of the Commission's decision, contending that the members added by the amendment lacked a "common bond" with the previous State employee membership of the Credit Union in violation of G.S. 54-109.26. Judge Braswell agreed with petitioners and reversed the Commission in a judgment entered 10 January 1979. The Commission, Administrator, State Employees' Credit Union, North Carolina Association of County Commissioners and North Carolina League of Municipalities (hereinafter "respondents") appealed. The Court of Appeals reversed the superior court and remanded for entry of an order affirming the decision of the Commission. Petitioners filed a petition for discretionary review with this Court pursuant to G.S. 7A-31, which we allowed 6 May 1980.

Other facts pertinent to the decision are noted in the footnote

below.[1]

_____

[1] The State Employees' Credit Union (hereinafter "Credit Union") is a state-chartered credit union with a field of membership traditionally limited to State employees and certain others, such as public school teachers, whose salaries, for the most part, are paid by the State. It is apparently undisputed that the Credit Union is the largest in the world, exceeded in total assets only by the Pentagon Federal Credit Union and the Navy Federal Credit Union. At the time of the hearing in the trial court, the Credit Union employed some 200 persons in at least 18 full-time offices throughout the State. At the end of 1977, the Credit Union had assets of $270 million and had $72 million in real estate loans and $151 million in personal loans. In August 1978, the Credit Union had 15,000 members, some 70,000 of whom had joined in the preceding three years. During this period, approximately 2,500 new members joined the Credit Union each month and the field of persons eligible for membership totaled 200,000 *and their families.* G.S. 54-109.29 (Cum. Supp. 1979) provides that a qualified person remains a member of the Credit Union for life even though he may later cease to meet the requirements of membership. It is unquestioned that the Credit Union is one of the largest financial institutions in the State of North Carolina.

While directly in competition with private industry, the Credit Union is accorded numerous tax advantages. Both banks and savings and loan associations are subject to a state excise tax, the equivalent of an income tax and both pay federal income taxes. Credit unions are not subject to the state excise tax and are expressly exempt from federal income taxes. Banks and savings and loan associations are subject to intangible taxes on certain types of assets while credit unions are expressly exempted from any intangibles tax on all assets. Moreover, credit unions are the beneficiaries of a blanket "restriction of taxation" provided by G.S. 54-109.99 (Cum. Supp. 1979).

Other statutory requirements imposed on the private sector are not imposed on credit unions. Credit unions must maintain certain reserves based on a small percentage of risk assets while banks are required to maintain reserves based upon a substantially more burdensome reserve requirement. Commercial institutions are subject to strict examinations involving such areas as quality of management, technical compliance with consumer protection laws and securities procedures, as well as basic financial soundness. In contrast, the regulations with respect to examination of credit unions refer to financial soundness and liquidity only. It is particularly noteworthy that state-chartered credit unions are not subject to the general usury law of North Carolina and have their own interest rate structure set by the Credit Union Commission.

The services offered by the Credit Union are strikingly similar to those provided by the private sector. The record indicates that services offered by the Credit Union include consumer loans, mortgage loans, consumer financing, counseling, draft accounts, personal money orders, travelers' checks, United States Government bond sales, share accounts, and passbook accounts.

The impact of the favorable treatment accorded credit unions vis-à-vis the private sector was dramatized by the witness from the Watauga Savings and Loan Association. His testimony indicated that federal insurance regulations limit the amount of interest that may be paid by a savings and loan association on passbook savings to 5 1/4%. The Credit Union, on the other hand, was paying 7% on passbook

## II.

**[1]** We first consider the appropriate standard for judicial review of this administrative agency's decision.

The basic issue with which the courts below were confronted, and which we must now consider, is the propriety of an action taken by the North Carolina Credit Union Commission and its Administrator. The Credit Union Commission is an agency of the state, G.S. § 54-109.10 (Cum. Supp. 1979), and review of its actions is governed by the Administrative Procedure Act (hereinafter "APA"), General Statutes, Chapter 150A. G.S. § 150A-2(1) (1978).

Under the APA, a reviewing court's power to affirm the decision of the agency and to remand for further proceedings is not circumscribed. However, the court may reverse or modify only if

the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions; or
(2) In excess of statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Unsupported by substantial evidence admissible

---

savings in Watauga County at the time of the hearing in the trial court. Moreover, the witness testified that to his definite knowledge the savings and loan association was losing customers to the Credit Union.

Appellants' concern over the liberal interpretation of the "common bond" limitation is readily understood in light of the effect of the amendment. The amendment expanded the Credit Union's field of membership to include "all employees of governmental units in North Carolina whose employees are covered under a retirement system administered by the State of North Carolina." There are eight separate retirement systems administered by different departments of State government for various categories of local government employees. This includes virtually all employees of the units of local government, including employees of various cities, counties and other units such as housing authorities, airports, ports, ABC boards, etc. The result would be that approximately 30,000 persons and their families would be added to the field of the Credit Union's potential members by approval of the bylaw amendment. Additionally, the Credit Union would become eligible to merge with existing local credit unions serving an additional 23,000 employees. These numbers would undoubtedly be larger today and will continue to grow as government bureaucracy continues to grow.

under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or
(6) Arbitrary or capricious.

G.S. § 150A-51 (1978).

The Court of Appeals, while recognizing that its review was governed by G.S. 150A-51, failed to specify under which of the above listed standards it reviewed the decisions of the superior court and the Commission. Judge Braswell, in the superior court, relied on the first, second, fifth and sixth standards in reversing the Commission's decision. While we agree with the result reached by the superior court, we think it failed to apply the correct standard in reviewing the Commission's actions. In our opinion, the appropriate line of inquiry is whether the Commission's approval of the bylaw amendment is "[a]ffected by ... error of law." G.S. § 150A-51(4). Thus, the proper standard of review has nowhere been addressed in the lower courts. Selection of the proper standard is important in every appeal from an administrative decision because use of the correct standard clarifies the basic issues and focuses the reviewing court's inquiry on the relevant factors.

The appropriate standard can be determined only after an examination of the issues presented by the appeal. While petitioners claim that the Commission's decision is in violation of the constitution, in excess of statutory authority, unsupported by substantial evidence and arbitrary and capricious, both they and respondents agree that the propriety of the Commission's actions turns on the meaning accorded the term "common bond" in G.S. 54-109.26, or, as aptly put by Judge Hedrick, writing for the Court of Appeals, "whether the membership of the State Employees' Credit Union as enlarged by the amendment meets the 'common bond' requirement of G.S. § 54-109.26." When the issue with which this Court is confronted on this appeal is accurately set forth it becomes obvious that the basic issue is one of statutory interpretation. Any error made in interpreting a statute is an error of law, and the fourth of the standards enumerated above, whether substantial rights of petitioners have been prejudiced because the Commission's decision is affected by an error of law,[2] is the scope of our inquiry on this appeal.

---

[2] Because we decide this issue in favor of petitioners, we do not reach the question of the constitutionality of the bylaw amendment. Were we to decide the

This case does not involve a decision that is made in excess of statutory authority, that is unsupported by substantial evidence, or one that is arbitrary or capricious. Although it can be argued that if the Commission approved a bylaw based on an erroneous and overly broad statutory interpretation it exceeded its statutory authority, this argument ignores the gist of the alleged error, the meaning of "common bond." If the scope of the bylaw exceeds that permissible under the statute, the *basic* error is still one of law, not of exceeding statutory authority. No one denies the statutory authority of the Administrator and Commission to approve and enact bylaw amendments; it is the bylaw itself with which we are concerned. When determining which standard or standards are appropriate to employ in a particular case, the standard which deals most directly with the alleged error, the gravamen of the petitioners' complaint, is the proper scope of review.

Nor does this appeal raise questions of the sufficiency of the evidence to support the Commission's implicit finding that a "common bond" exists. If the "common bond" requirement is satisfied by employment in the public sector, as the Court of Appeals held, there is ample and uncontroverted evidence that all persons made eligible for membership by the amended bylaw possess the characteristic of governmental employment.

We also disagree with the superior court's conclusions that the Commission's decision was arbitrary and capricious and that the decision was in violation of constitutional provisions. The record is devoid of evidence showing that the Commission acted in any manner other than reasonably, albeit erroneously. And, in view of our disposition of the case in petitioners' favor, we need not consider the constitutional issue.

The remainder of this opinion will be concerned with the proper interpretation of "common bond." When the issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely substitute its judgment for that of the agency and employ *de novo* review. Daye, *North Carolina's Administrative Procedure Act: An Interpretive Analysis,* 53 N.C.L. Rev. 833, 915 (1975); *see State ex rel. Commissioner of Insurance v. Rate Bureau,* 300 N.C. 381, 450, 269 S.E. 2d 547, 589 (1980); Director,

statutory issue otherwise, however, we would have to consider the bylaw's constitutionality.

Office of Workers' Compensation Programs, *U.S. Department of Labor v. O'Keefe*, 545 F. 2d 337 (3d Cir. 1976). Although the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, those interpretations are not binding. "The weight of such [an interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Company*, 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124, 129 (1944). For the reasons given below, we find the Commission's interpretation of "common bond" unpersuasive.

III.

[2] The issue presented by this appeal is whether the field of membership of the Credit Union as set forth in the amended bylaw possesses a "common bond" as required by G.S. 54-109.26. We answer this question in the negative and reverse the Court of Appeals.

G.S. 54-109.26 (Cum. Supp. 1979) is the source of the common bond requirement and sets out, to some extent, what constitutes a common bond:

"Membership" defined.— (a) The membership of a credit union shall be limited to and consist of the subscribers to the articles of incorporation and such other persons within the common bond set forth in the bylaws as have been duly admitted members, have paid any required entrance fee or membership fee, or both, have subscribed for one or more shares, and have paid the initial installment thereon, and have complied with such other requirements as the articles of incorporation or bylaws specify.

(b) Credit union membership may include groups having a common bond of similar occupation, association or interest, or groups who reside within an identifiable neighborhood, community, or rural district, or employees of a common employer, and members of the immediate family of such persons.

We can affirm the Court of Appeals and allow the amended bylaw

to stand only if the field of membership set forth therein possesses a "common bond."

In construing the meaning of "common bond," we must, as is always the case in statutory interpretation, ascertain and adhere to the intent of the Legislature in enacting this requirement. *In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978). The best indicia of that legislative intent are "the language of the act, the spirit of the act and what the act seeks to accomplish." *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972).

The language of G.S. 54-109.26 is the basic source for determining the meaning of and the legislative intent behind the requirement of a common bond. Subsection (b) of that statute identifies three ways in which a common bond may be established: (1) similar occupation, association or interest; (2) residence within an identifiable neighborhood, community, or rural district; and (3) common employer. Unless the membership requirements of a credit union fall within one of the three specified categories, the "common bond" requirement has not been met and the bylaw governing membership must fall.

State, county and municipal employees, who by the amended bylaw are within the field of membership, clearly do not fall within the category of residence within a common identifiable neighborhood nor do they share a common employer. If the bylaw contested here is to pass the muster of the "common bond" requirement, it must do so under the category of similar occupation, association or interest. The Court of Appeals upheld the bylaw because it found that all persons within the newly defined field of membership share a similar occupation. We disagree.

First, it is obvious from subsection (a) of G.S. 54-109.26 that all persons eligible for membership in a credit union must share one and the same common bond: "The membership of a credit union shall be limited to and consist of . . . persons within the common bond . . . ." If the contested bylaw is to be upheld on the basis of similar occupation, then *each* member must share a similar occupation with every other member. If the commonality is premised on association or interest, all persons within the field of membership must possess the same association or interest.

Additionally, if the common bond requirement were anything

but universal for the entire membership, it would be rendered meaningless. For example, it is beyond question that there are certain groups of county and municipal employees who share similar occupations with state employees: both state and local governments employ law enforcement officers, public health personnel, tax collectors, etc. If the requisite degree of commonality required for a "common bond" to exist could be met by showing similarity of occupation for sub-groups of the membership only, the scope of eligible membership would know no bounds and the Legislature's enactment of the common bond requirement would be rendered a nullity.

Respondents urge that we construe the common bond limitation of credit union membership broadly so as to most fully effectuate the Legislature's intent. While we are bound to construe the limitation with due regard to the legislative intent, we are powerless to construe away the limitation just because we feel that the legislative purpose behind the requirement can be more fully achieved in its absence.

**[3]** Undoubtedly, the Legislature enacted the common bond provision to promote the financial stability of credit unions by requiring that the members possess substantial unity of character and interest. Only with some assurance of stability can the purpose of credit unions be achieved:

> A credit union is a cooperative, nonprofit association, incorporated . . . for the purposes of encouraging thrift among its members, creating a source of credit at a fair and reasonable rate of interest, and providing an opportunity for its members to use and control their own money in order to improve their economic and social condition.

G.S. § 54-109.1 (Cum. Supp. 1979). To ensure the financial stability of credit unions the Legislature imposed the requirement that all persons eligible for membership in a particular credit union possess a commonality of interest. G.S. § 54-109.26. Thus, the nature of the common bond itself must provide some guarantee of financial cohesiveness and stability. Not all shared interests carry even a minimal assurance of financial success, and, for that reason, not all shared traits constitute common bonds. Only those factors common to the entire field of membership which, of themselves, tend to

promote financial stability qualify as common bonds. It does not follow, however, that all factors which provide some guarantee of financial stability satisfy the common bond requirement. To qualify as a common bond, the trait or factor must be *common to all eligible for membership*, and its very nature must provide the assurance of stability. The Legislature has chosen and specified the means to achieve financial stability; we are bound by the limitations inherent in that means and cannot ignore those limitations simply because we see a better way to achieve the Legislature's purpose. For this reason, we cannot adopt petitioners' argument that any factor which contributes to the success of a credit union qualifies as a common bond. Otherwise, the growth of credit unions would continue unchecked, if for no reason other than the adage that "there is safety in numbers."

### A. *Similar Occupation*

**[4]** The Court of Appeals found the requisite similarity in occupation in who is served by the eligible members, *i.e.*, the public, and who paid the members' salaries, *i.e.*, the public:

> In our opinion public employees are united by the common bond of similar occupation for the simple reason that they are all employed in the service of the community, whether that community be narrowly defined as is the case with local public employees, or broadly delineated as in the case of state public employees. They all occupy positions in public service. Moreover, such employees are all paid from public funds generated by taxing the citizenry. They serve the public; the public pays their salaries. These two characteristics are common to the membership as envisaged by the amendment to the bylaw in question here. We hold that these factors in particular provide sufficient similarity of occupation, despite the individual place and position of the employee, to meet the "common bond" requirement of G.S. 54-109.26.

We cannot accept the Court of Appeals' interpretation of occupation. We consider similarity in occupation to mean similarity in the actual work done — similarity in occupational duties and responsibilities. Under the similar occupation category, groups such as nurses, law enforcement officers and textile workers could each band together to form their own *separate* credit union. Similarity in

occupation cannot be premised upon similarity in who is benefited and who pays. If we were to affirm the Court of Appeals and adopt its reasoning, all employees in the private sector could form a credit union; private industry would provide the common bond. Private industry benefits from their labor and pays their salaries. Such a broad interpretation would make a farce of the common bond requirement and would render void and without meaning the legislative declaration that "credit union [membership]... be *limited* to ... persons within the common bond ...." G.S. § 54-109.26 (emphasis added).

The Court of Appeals specifically rejected the definition of "similar occupation" that we now adopt. They reasoned thusly:

The fallacy of petitioners' approach to defining "similar occupation" by reference to job description becomes obvious when we examine the composition of the Credit Union prior to the amendment. If petitioners' logic were to prevail, the Chief Justice of our Supreme Court, a State government employee, would have nothing in common with an orderly at Dorothea Dix Hospital, also a State government employee. Yet, by virtue of their occupational status as State government employees, both have been eligible for membership in the State Employees' Credit Union since its creation. On the other hand, a State highway patrolman would have no more in common, as far as employment description, with a county sheriff than he would have with a Greek professor at a State-supported university. But, as petitioners see it, the State patrolman and the county sheriff are not eligible for membership in the same credit union. When viewed in this light, petitioners' position regarding the meaning of "similar occupation" defeats their purported purpose to prove that local and county governmental employees enjoy no "common bond" of similar occupation with State government employees.

The Court of Appeals apparently confused the categories providing the common bond. The Chief Justice of this Court, an orderly at a state hospital and a highway patrolman can belong to the same credit union because they *all* share a common employer, the state. The same highway patrolman can belong to a credit union composed of law enforcement officers, state, county and municipal,

because *all* share a similar occupation, law enforcement. But, although a county sheriff does share the common bond of similar occupation with some state employees, he does not share any single common bond with *all* state employees, and, for that reason, the county sheriff cannot belong to a credit union composed solely of state employees. The "common bond" must be a single one, shared by all persons eligible for membership.

Because county, municipal and state employees do not *all* engage in similar types of work with similar job descriptions, they do not share a common bond of similar occupation and the amended bylaw cannot be upheld on this basis. As to this point, the Court of Appeals is reversed.

### B. *Similar Association or Interest*

[5]   We now turn to a determination of whether the class of persons eligible for Credit Union membership under the amended bylaw possesses the common bond of similar association or interest.

These terms are nowhere defined in the statute which sets them forth. In ordinary parlance, "association" means the act of associating or bringing into company with another, *American Heritage Dictionary of the English Language* 80 (1969), and "interest" has several meanings, including a feeling of curiosity or fascination, an advantage or self-interest and a right, claim or legal share. *Id.* at 683. While we could construe the terms in the statute to comport with their meanings in common usage, we think the Legislature intended otherwise and used those words in a limited sense.

As emphasized above, the Legislature expressly set forth the common bond requirement as a limitation on the scope of a credit union's membership. Were we to interpret "association" and "interest" broadly in their ordinary senses, any common curiosity or fascination, no matter how small or insignificant, would satisfy the common bond requirement, with the end result that the statutorily imposed common bond limitation would, in practice, be no limitation whatsoever. We refuse to interpret one subsection in a manner that renders another subsection of the same statute a nullity.

Additionally, when the terms "association" and "interest" are read within the context of the other categories of common bonds, it becomes obvious that shared commonality in association or interest must be both substantial and vital.

The commonality of those who share similar occupations lies in their livelihood, the means by which those persons make a living. The common interest of those who share a common employer are substantial in number and vital in character. Common residential area requires a common interest in the geographic area in which one makes one's home. All these interests are substantial and each is vitally important to the persons involved.

Whether a common trait constitutes a similar association or interest can be determined only on a case-by-case basis; we do not pretend in this opinion to delineate or even attempt to give examples of what traits constitute this type of common bond. But whatever "traits" those terms include, they must rise to at least the same level of substantiality and be just as vital as the other types of common bonds enumerated by the Legislature.

Respondents contend that the limitation of membership to governmental employees covered under a state-administered retirement system provides a common bond of similar interest. An examination of just what this common interest is, however, reveals that the threshold requirements of a "common bond" have not been met.

The retirement systems administered by the state are eight in number. They are funded by separate sources and serve separate classifications of employees and are not all administered by the same state agency. The record discloses that six are administered under the State Treasurer: the Uniform Judicial Retirement System, the Teachers' and State Employees' Retirement System, the Local Governmental Employees' Retirement System, the Uniform Solicitorial Retirement System, the Uniform Clerks of Superior Court Retirement System, and the Legislative Benefit and Retirement Fund; the other two, the Law-Enforcement Officers' Benefit and Retirement Fund and the Firemen's Pension Fund are administered by the State Auditor's Office. The function of the state in administering these funds is limited to mere bookkeeping, and the bookkeeping for each fund is done separately. Even if common administration were a similar interest which would satisfy the common bond requirement, membership in a state-administered retirement system still would not provide a common bond because the retirement systems do not share a common bookkeeper and the bookkeeping and investment for each fund is done separately and independently. The only commonality shared by all persons who are covered by a state-administered retirement system is that the

persons who perform the bookkeeping functions for each fund share a common employer, the state. That shared interest is remote and insubstantial; such an interest does not rise to the level of a common bond.

Respondents raised this contention in the Court of Appeals, and that court rejected it. As to this point, the Court of Appeals is affirmed.

Thus, we hold that state, county and municipal employees included within the Credit Union's membership by the amended bylaw do not possess a common bond of similar association or interest. We conclude that the class of persons set forth in the amended bylaw possesses no common bond of any type.[3] For that reason, the action of the Commission in approving the amended bylaw must be reversed because it is affected by error of law, G.S. § 150A-51(4).

## IV.

In light of our decision above, it is unnecessary for us to address petitioners' contention that the Commission's approval of the amendment was in violation of the equal protection clause of the United States and North Carolina Constitutions and in violation of the provision against unlawful discrimination in taxation contained in Article V, section 2 of the North Carolina Constitution. For the same reason, it was unnecessary for Judge Braswell to rule on the constitutional issue in the trial court, and that portion of his judgment must be vacated. We note, however, that serious constitu-

---

[3] It is suggested in dissent that the "sad" result of this opinion is that local government employees will not hereafter be able to obtain credit. This is not only an insult to that segment of the state's population, it is a reckless disregard of the rule that appellate courts must base their decisions only on information contained in the record and not on individual speculation. The speculation that local government employees will be unable to obtain credit at private financial institutions does not comport with the minority's insistence that we view this case with "common sense and some familiarity with the world around us."

It is too late in the day to respond to other points raised in the minority opinion. Suffice it to say that a fair reading of this opinion will indicate that our decision is in no way based on the tax advantages accorded credit unions or on the size of this credit union. Contrary to the assumptions made by the dissent, our interpretation of the term "common bond" is based solely on what we perceive to be the legislative intent. The suggestion by the minority that there are ulterior motives for this decision is, we think, both unfair and unwarranted.

tional questions would arise were the Court of Appeals' opinion allowed to stand. If the meaning of "common bond" were broadened to the extent allowed by that court, then the constitutional issue would have to be examined anew. There must be a discernible justification for the preferential treatment granted credit unions in the absence of a meaningful common bond limitation.

V.

For the reasons stated above, the decision of the Court of Appeals is affirmed in part and reversed in part. This cause is remanded to that court with instructions to remand to the Superior Court, Wake County, for entry of judgment consistent with this opinion.

Affirmed in part,

Reversed in part and

Remanded.

Justice EXUM dissenting.

I agree with the majority that the dispositive question on this appeal is whether municipal and county employees, whom I will refer to as local government employees, share with state government employees a "common bond," as that term is used in G.S. 54-109.26 (Cum. Supp. 1979), so that all can belong to the same credit union. Being satisfied that there is the necessary common bond between the two groups of governmental employees, I respectfully dissent from the majority's conclusion to the contrary and vote to affirm the decision of the Court of Appeals.

It takes little more than common sense and some familiarity with the world around us to know that local government employees and state government employees share a common bond of "similar occupation, association or interest" as those terms are used in the statute. Judge Hedrick made the point nicely when, for a unanimous Court of Appeals panel, he wrote:

"In our opinion public employees are united by the common bond of similar occupation for the simple reason that they are all employed in the service of the community, whether that community be narrowly defined as is the case with local public employees, or broadly deli-

neated as in the case of State public employees. They all occupy positions in public service. Moeover, such employees are all paid from public funds generated by taxing the citizenry. They serve the public; the public pays their salaries. These two characteristics are common to the membership as envisaged by the amendment to the bylaw in question here. We hold that these factors in particular provide sufficient similarity of occupation, despite the individual place and position of the employee, to meet the 'common bond' requirement of G.S. Sec. 54-109.26."

45 N.C. App. 19, 23, 262 S.E. 2d 361, 364 (1980). Surely these factors give local and state government employees sufficient similarity of "association" and "interest," if not "occupation," under the majority's unrealistic, restrictive view of what similar occupation means — a view which I reject.

Similar occupation does not mean identical occupation in the sense that all workers must perform identical work-related functions in order to be in the same credit union. The majority correctly asserts, for example, that all workers in the textile industry, or all persons involved in law enforcement, could form "their own separate credit union." Yet workers engaged in the textile industry do a multitude of different functions and have a number of different occupations in the majority's narrow view of that term. They include weavers, dyers, mechanics, engineers, chemists, and even physicians. Yet all are workers in the textile industry and all contribute to the making of the ultimate product, textile goods. The same may be said of those engaged in law enforcement. Their varying occupations include traffic patrolmen, detectives, administrators, chemists, ballistics experts, crime scene reconstruction experts, etc. Yet all could, the majority concedes, join a "law enforcement" credit union because they are all engaged in law enforcement activity.

So it is with those who work for local and state government. Although they perform different functions and may be said to have different occupations, they are joined by the common bond of being public servants. They all contribute together producing essentially the same product, i.e., those and only those governmental services which are demanded by the people through the constitution and statutes of this state. They work in the same industry — the industry of government.

Nor, as I think the above discussion demonstrates, are governmental employees and private sector employees on different sides of the same "common bond" coin. Contrary to the majority's assertion, it does not follow that if local and state government employees are permitted to form a credit union under the common bond of "similar occupation, association or interest," then a "private sector" credit union must also be permitted. The private sector consists of a multitude of different industries, composed in turn of many different privately-owned for-profit business organizations, which make countless different products and provide a variety of different services and which run on capital voluntarily and privately supplied from countless investors.

The acid test, as the majority correctly notes, is whether the common bond is sufficient "to promote the financial stability of credit unions by requiring that the members possess substantial unity of character and interest. Only with some assurance of stability can the purpose of credit unions be achieved." The common bond requirement is for the protection of the credit union itself not, as the majority seems to imply, for the purpose of restricting the size or operation of any given credit union in order to protect private for-profit financial institutions with whom credit unions may compete. The common bond of those employees engaged in providing governmental services to our people at both state and local levels meets this test. A purported private sector "common bond" would surely not.

The tax advantages given to credit unions organized under Chapter 54 of the General Statutes are not provided, as the majority suggests, because their size and operations are restricted by the common bond requirement. The tax advantages are provided because these credit unions are non-profit associations operated and controlled by their own members. They provide credit to people whose only collateral is often the income they derive from a steady job. They provide credit, in other words, to people who would not be able to obtain it at privately-owned for-profit financial institutions. The majority seems to view the common bond requirement as a method for restricting the growth and operational potential of membership owned, nonprofit, credit unions so that they will not unduly compete with privately-owned for-profit financial institutions. This mistaken view of the reason for the common bond requirement has, I fear, led the majority to an unduly restrictive view

Savings and Loan League v. Credit Union Comm.

of what constitutes the common bond of similar occupation, associa-
tion or interest, a restrictive view never intended by the legislature.

The majority, for example, speaks at length in note 1 of the size
of the North Carolina State Employees' Credit Union and seems
concerned because it might compete unfairly with for-profit finan-
cial institutions in the private sector. While the State Employees'
Credit Union may be large when compared with other credit unions,
its size and operational potential even if expanded to include local
government employees is quite small when compared to the size
and operational potential of private for-profit financial institutions.
According to the majority's figures the Credit Union's assets in
1977 were $270,000,000 with some $223,000,000 in loans. As I read
the record, if local government employees are added to the member-
ship there would be approximately 250,000 eligible members in
North Carolina. Without this addition there are approximately
200,000 eligible members. Yet *all* North Carolina credit unions,
including the State Employees' Credit Union, have only 4.5% of total
consumer savings in the state.

The record shows on the other hand that the total assets of the
186 savings and loan associations which comprise the North Caro-
lina Savings & Loan League have assets approaching ten *billion*
dollars. The total assets of all banks in North Carolina (both state
and national), according to figures obtained from the Commissioner
of Banks, was more than twenty-two *billion* dollars as of 30 Septem-
ber 1980. The record shows, further, that the total North Carolina
work force numbers approximately 2,600,000 persons. Therefore
only 9.5% of the total work force would be eligible for membership
in the State Employees' Credit Union if it is expanded to include
local government employees who themselves comprise only 2% of
that work force. It is estimated that only 5% of credit union
members save exclusively at their unions. The rest save also at
banks and savings and loan associations. The expansion of the
Credit Union to include local government employees would seem to
constitute little, if any, economic threat to private for-profit finan-
cial institutions.

The really sad aspect of the majority's opinion is that thousands
of local government employees who are not eligible for credit at
private for-profit financial institutions simply cannot obtain the
credit needed "to improve their economic and social conditions."
The statute entitles them to membership in the State Employees'

Credit Union where such credit would be available. The majority erroneously denies them this privilege.

Justice COPELAND joins in the dissent.