IN RE: PETITION FOR JUDICIAL REVIEW BY E. I. DuPONT DE NEMOURS
AND COMPANY, INC.

No. 9210SC253

(Filed 6 April 1993)

**Environmental Protection, Regulation, and Conservation § 75
(NCI4th) — wastewater treated in elementary neutralization
systems — no solid waste — no hazardous waste — assessment of
tonnage fee improper**

The legislature did not intend for wastewater treated in
elementary neutralization systems and discharged pursuant
to NPDES permits to be assessed the tonnage fee set forth
in N.C.G.S. § 130A-294.1(g), since that statute applies to any
facility which generates the requisite amount of hazardous
waste, and in order for a substance to be classified as a hazard-
ous waste, a substance must first be considered a "solid waste"
as defined in N.C.G.S. § 130A-290(8) and N.C.G.S. § 130A-290(35).

**Am Jur 2d, Pollution Control §§ 185, 248 et seq., 277 et seq.**

Appeal by respondent from order entered 13 December 1991
by Judge Henry V. Barnette, Jr. in Wake County Superior Court.
Heard in the Court of Appeals 13 January 1993.

*Attorney General Lacy H. Thornburg, by Assistant Attorney
General Judith Robb Bullock, for the State.*

*Hunton and Williams, by Charles D. Case, William D. Dannelly
and Ethan S. Naftalin, for E.I. du Pont de Nemours & Com-
pany, Inc.*

LEWIS, Judge.

The question presented by this most amenable appeal is whether
the legislature intended for wastewater treated in elementary
neutralization systems and discharged pursuant to NPDES permits

to be assessed a tonnage fee as per N.C.G.S. § 130A-294.1(g). We do not think that the legislature so intended and we hereby affirm the decision of the superior court.

N.C.G.S. § 130A-294.1(g) was enacted in 1987 and provides:

> A person who generates one kilogram or more of acute hazardous waste or 1000 kilograms or more of hazardous waste in any calendar month during the calendar year shall pay, in addition to any fee under subsections (e) and (f) of this section, a tonnage fee of fifty cents ($0.50) per ton or any part thereof of hazardous waste generated during that year up to a maximum of 25,000 tons.

Concerned that it might be subject to N.C.G.S. § 130A-294.1(g), Du Pont filed a request for a declaratory ruling with the North Carolina Department of Environment, Health, and Natural Resources (formerly Department of Human Resources, "DEHNR" will be used to refer to both) on 12 September 1989 addressing the question of whether Du Pont's four facilities in North Carolina were covered by N.C.G.S. § 130A-294.1(g). The two specific questions posed by Du Pont were:

> 1. Are materials contained in properly permitted wastewater discharges at DuPont facilities . . . not subject to reporting in a hazardous waste generator's annual hazardous waste generation report?

> 2. Are materials contained in properly permitted wastewater discharges at DuPont facilities . . . not subject to hazardous waste generator fees under N.C. Gen. Stat. § 130A-294.1?

Du Pont filed supporting documentation with its request and urged DEHNR to answer both of the above questions in the affirmative.

On 22 October 1990, Ronald H. Levine, the State Health Director, issued his Declaratory Ruling answering both of the above questions in the negative. As the basis for his ruling, Mr. Levine found that the fee schedule in N.C.G.S. § 130A-294.1(g) did not contain an exemption for wastewaters and that wastewaters are not excluded from the definition of solid waste while they are being generated, collected, stored or treated before discharge. Mr. Levine further concluded that Du Pont was required to report its wastewater hazardous waste even if the wastewater was man-

aged in exempt units such as elementary neutralization tanks or in totally enclosed tanks.

Thereafter, on 26 November 1990, Du Pont filed a Petition for Judicial Review in Wake County Superior Court. Judge Henry V. Barnette heard the matter on 14 October 1991 and issued his ruling on 13 December 1991 effectively reversing the Declaratory Ruling. In his order, Judge Barnette held that wastewaters in elementary neutralization units, wastewater treatment facilities and totally enclosed treatment units were exempt from regulation under N.C.G.S. § 130A-294.1(g). Judge Barnette further concluded that wastewater discharged under permits issued under Section 402 of the Clean Water Act was excluded from the definition of hazardous waste. Judge Barnette also concluded that because the fees assessed under N.C.G.S. § 130A-294.1(g) were intended to support the North Carolina hazardous waste management program, the General Assembly did not intend that such fees should be assessed on wastewater treated in units not regulated under that program. DEHNR gave notice of appeal from Judge Barnette's ruling on 10 January 1992.

To understand the positions of the parties, it is important to understand the neutralization processes as well as the regulatory background under which Du Pont operates. Du Pont has several facilities throughout North Carolina, and four of these facilities produce acid-caustic neutralized water through their operations: Kinston, Cape Fear, Brevard and Fayetteville. The acid-caustic neutralized water from these four facilities is produced in one of four different methods: Demineralized Water Ion Exchange, DMT Polymerization Vessel Cleaning, Vapor and Raw Material Scrubbing, and Nitric Acid Cleaning. Du Pont uses various acids and caustic solutions as cleaning agents. Once the acids and caustic solutions are used, they are collected in totally enclosed tanks where they are neutralized. The resulting wastewater is then discharged by Du Pont pursuant to NPDES permits. Admittedly this is an oversimplification of the entire process, but it is all that is required for the purposes of this opinion.

The regulatory background is also important to a complete understanding of the parties' positions. Hazardous wastes are regulated under a dual system of federal and state enactments. The federal statutes are contained in the Resource Conservation and Recovery Act ("RCRA") and the State counterpart is the North

Carolina Solid Waste Management Law contained in Article 9 of Chapter 130A of the North Carolina General Statutes. For the most part, the North Carolina Rules have been adopted verbatim from the RCRA Rules. Since the North Carolina Rules are consistent with those adopted under RCRA, North Carolina has been allowed to operate its own hazardous waste management program in lieu of the federal program. It is for this reason that DEHNR argues so strenuously in favor of reversing the trial court's ruling. DEHNR claims that North Carolina must adhere to the federal interpretation in order to maintain the necessary equivalency and consistency to operate a state program. DEHNR further claims that to uphold the trial court's ruling would risk potential revocation of North Carolina's own hazardous waste program.

With the stage set, we now turn to the arguments of the parties. The essence of Du Pont's argument is that all the wastewater it discharges is covered by NPDES permits and therefore it is not subject to the tonnage fee in N.C.G.S. § 130A-294.1(g). Du Pont's logic has substantial merit especially in light of the language of N.C.G.S. § 130A-290 which provides that the definitions there are to be applied throughout the Article. Therefore, it is necessary to look at the statutory definitions provided by the legislature.

N.C.G.S. § 130A-294.1(g) applies to any facility which generates the requisite amount of *hazardous waste*. The definition of hazardous waste is contained in N.C.G.S. § 130A-290(8) and provides in pertinent part:

> "Hazardous waste" means a <u>solid waste</u>, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical or infectious characteristics may:
>
> > a. Cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness; or
> >
> > b. Pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of or otherwise managed.

(Emphasis added). Thus, it is clear that in order for a substance to be classified as a hazardous waste, a substance must first be considered a "solid waste." The term solid waste is defined by N.C.G.S. § 130A-290(35) and specifically excludes:

**IN RE PETITION BY E. I. DuPONT DE NEMOURS AND CO.**

[109 N.C. App. 435 (1993)]

b. Solid or dissolved material in . . .

3. Wastewater discharges and the sludges incidental to and generated by treatment which are point sources subject to permits granted under Section 402 of the Water Pollution Control Act, as amended (P.L. 92-500), and permits granted under G.S. 143-215.1 by the Environmental Management Commission.

There is no dispute that Du Pont operates its facilities with NPDES permits granted under Section 402 of the Water Pollution Control Act. As a result, Du Pont claims that its wastewaters are exempt from the definition of a solid waste and thus cannot be hazardous wastes subject to the tonnage fee in N.C.G.S. § 130A-294.1(g).

In opposition, DEHNR contends that the terms of N.C.G.S. § 130A-294.1(g) are clear and unambiguous. As such, anyone who generates the requisite amount of waste is required to pay the tonnage fee. DEHNR further disagrees with Du Pont's argument that it is excluded from the definition of hazardous waste. In so doing, DEHNR attempts to draw a distinction between wastewater discharges and wastewater. In support of this distinction DEHNR cites to several federal authorities. See 45 Fed. Reg. 33098(1980); 40 C.F.R. 261.4(a)(2). More specifically, it is the comment to 40 C.F.R. 261.4(a)(2) which DEHNR urges has been incorporated by reference in 15A NCAC 13A .0006. This comment states as follows: "This exclusion applies only to the actual point source discharge. It does not *exclude* industrial wastewaters while they are being collected, stored, or treated before discharge. . . ." DEHNR concedes in its brief that this comment does not appear in the North Carolina statutory language, but argues that it does support the position urged by DEHNR. We agree that the comment to 40 C.F.R. 261.4(a)(2) is supportive of DEHNR's position, but we also recognize that a C.F.R. comment is not binding on this Court, especially when interpreting a statute that is purely a creature of North Carolina law and one that has no federal counterpart.

We have given careful consideration to the arguments of counsel and note that there is merit to both sides of this appeal. However, in deciding this appeal, we are bound by two firmly established rules of jurisprudence. The first of these is the standard of review which governs our review of the trial court's decision. In this matter our review is governed by N.C.G.S. § 150B-52, controlling appeals of agency decisions from the Superior Court to the Court

of Appeals. Under § 150B-52, this Court is limited in its review to whether the trial court committed any errors of law in light of its application of the standard of review in N.C.G.S. § 150B-51. *Sherrod v. North Carolina Dep't of Human Resources*, 105 N.C. App. 526, 414 S.E.2d 50 (1992).

The trial court held in its order that DEHNR had committed an error of law in interpreting N.C.G.S. § 130A-294.1(g) so as to apply to Du Pont's facilities. The trial court in reviewing the decision of DEHNR was required to follow N.C.G.S. § 150B-51(b) which provides in pertinent part:

> After making the determinations, if any, required by subsection (a), the court reviewing a final decision may affirm the decision of the agency or remand the case for further proceedings. It may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions or decisions are:
>
> (1). In violation of constitutional provisions;
>
> (2). In excess of the statutory authority or jurisdiction of the agency;
>
> (3). Made under unlawful procedure;
>
> (4). Affected by other error of law;
>
> (5). Unsupported by substantial evidence . . .; or
>
> (6). Arbitrary or capricious.

An error in interpreting a statute comes under subsection (4) of N.C.G.S. § 150B-51. *In re North Carolina Savings and Loan League*, 302 N.C. 458, 276 S.E.2d 404 (1981). Since DEHNR's ruling involved an interpretation of the terms of N.C.G.S. § 130A-294.1(g), it was not error for the trial court to substitute its interpretation N.C.G.S. § 130A-294.1(g) for that of DEHNR. *Id.* Thus under the circumstances, it was proper for the trial court to have applied a de novo review and we in turn review the decision of the trial court by looking to see if there were any errors of law.

Having reviewed the record as a whole, we conclude that no errors of law were committed by the trial court. In so doing, we are guided by our second firmly established rule of jurisprudence, that in interpreting statutes it is the role of this Court to ascertain

IN RE PETITION BY E. I. DuPONT DE NEMOURS AND CO.

[109 N.C. App. 435 (1993)]

the intent of the enacting legislature. *Electric Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 403 S.E.2d 291 (1991). DEHNR argues that the statute is clear on its face and that we need not look to the legislative intent, but the fact that both the trial court and DEHNR reached opposite conclusions on the interpretation of the same statute is ample evidence that N.C.G.S. § 130A-294.1(g) is not as clear as DEHNR would have us believe.

In arguing that it was not the intention of the legislature for Du Pont's facilities to be subject to the tonnage fee, Du Pont has cited us to two strong pieces of evidence. The first of these is the 1988 Fee Bill. *1987 N.C. Sess. Laws ch. 1020, s. 6.* The 1988 Fee Bill provided that:

> [DEHNR] shall study the application of tonnage fees imposed by Section 2 of this act to wastewaters. The study shall include an analysis of wastewater tonnage fees in the context of tonnage fees or [sic] other waste forms, alternate rates, and methods of calculation of wastewater tonnage fees and the effect of any recommended charges on the overall fee schedule.

This directive from the legislature to DEHNR indicates that the legislature intended N.C.G.S. § 130A-294.1(g) to have only prospective application. Since the 1988 Fee Bill, however, there has been no affirmative act by the legislature directing DEHNR to begin applying the tonnage fees to wastewater. The only communication between the legislature and DEHNR in response to the 1988 Fee Bill was DEHNR's *North Carolina Waste Water Study for 1989 General Assembly* ("Study"). In the Study, DEHNR expressed concern that it may not have the authority to require reporting of wastewater and further whether or not the tonnage fees should even be imposed on wastewater. In the Study, DEHNR also told the General Assembly that "[i]ncluding this waste [hazardous wastewater] in our total generation figure is necessary in order to receive funds needed to manage the hazardous waste program." Even in light of the reservations expressed by DEHNR, the legislature still did not take any affirmative action authorizing DEHNR to begin collecting the tonnage fee on wastewater. As a result, we find the 1988 Fee Bill and DEHNR's response to be more than ample evidence that it was not the intent of the legislature for totally enclosed neutralization facilities such as those at Du Pont to be subject to the tonnage fee in N.C.G.S. § 130A-294.1(g).

DEHNR contends, however, that its Study to the General Assembly put the legislature on notice as to DEHNR's trepidation to collect tonnage fees from wastewater facilities and the fact that the legislature did not act showed its acquiescence to the collection of these fees. Inaction is a poor basis upon which to infer consent, and we believe that the failure of the legislature to take that action was not a directive for DEHNR to begin collecting tonnage fees as DEHNR would suggest.

The second piece of strong evidence for Du Pont is the use to which the tonnage fee is put. N.C.G.S. § 130A-294.1(a) provides: "It is the intent of the General Assembly that the fee system established by this section is solely to provide funding in addition to federal and State appropriations to support the State's hazardous management program." The uses for these funds are set forth in section (b) of N.C.G.S. § 130A-294.1 which provides:

Funds collected pursuant to this section shall be used for personnel and other resources necessary to:

(1) Provide a high level of technical assistance and waste minimization effort for the hazardous waste management program;

(2) Provide timely review of permit applications;

(3) Insure that permit decisions are made on a sound technical basis and that permit decisions incorporate all conditions necessary to accomplish the purposes of this Part;

(4) Improve monitoring and compliance of the hazardous waste management program;

(5) Increase the frequency of inspections;

(6) Provide chemical, biological, toxicological, and analytical support for the hazardous waste management program; and

(7) Provide resources for emergency response to imminent hazards associated with the hazardous waste management program.

Du Pont's wastewater is currently treated in units that are not regulated by North Carolina's hazardous waste management program. Therefore, any fees collected from Du Pont would have gone

to the operation of the hazardous waste management program of North Carolina, of which Du Pont's discharges would not have been a part. We do not think that the legislature intended to impose a double fee on Du Pont. Therefore, the decision of the trial court holding that Du Pont is not required to pay the tonnage fee in N.C.G.S. § 130A-294.1(g) is affirmed.

In so doing, we also affirm the trial court's decision that Du Pont is not required to report its wastewater. We further feel that our decision does not harm the North Carolina regulatory scheme since the statute at issue in this case is entirely a creature of the North Carolina General Assembly and has nothing to do with North Carolina maintaining equivalency and consistency with federal statutes.

For the foregoing reasons, the decision of the trial court is

Affirmed.

Judges WELLS and COZORT concur.